**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-01376-SKC-NRN

WENDY FAUSTIN,

      Plaintiff,

v.

JARED POLIS, in his official capacity as Governor of Colorado, *et al.*,

      Defendants.

---

### THE STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

      Defendants Jared Polis, in his official capacity as the Governor of Colorado, and Philip J. Weiser, in his official capacity as the Attorney General of Colorado (collectively, the "State Defendants"), through undersigned counsel, respectfully move under Fed. R. Civ. P. 56 for summary judgment on Count One of the Amended Complaint [Dkt. 69].

### CERTIFICATE OF CONFERRAL

      The parties met and conferred on February 24, 2025, concerning the motion and the undisputed material facts. Plaintiff Wendy Faustin opposes the relief requested herein.

### ARTIFICIAL INTELLIGENCE CERTIFICATION

      The State Defendants and their counsel certify that no portion of this filing was drafted by Artificial Intelligence.

## INTRODUCTION

Over thirty years ago, the Colorado General Assembly exercised its police power to protect the right of *all* individuals to unimpeded access to healthcare facilities for the purpose of receiving *any* healthcare, including but certainly not limited to abortion care. Specifically, it enacted House Bill 93-1209, which is codified at C.R.S. § 18-9-122 and contains a provision known as the "bubble zone" because it prohibits a person from:

> knowingly approach[ing] another person within eight feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way or sidewalk area within a radius of one hundred feet from any entrance door to a health-care facility.

§ 18-9-122(3) ("Subsection 122(3)"). Since then, the bubble zone has carefully balanced "a person's right to protest or counsel against certain medical procedures . . against another person's right to obtain medical counseling and treatment in an unobstructed manner." § 18-9-122(1).

Shortly after its enactment, a group of abortion opponents challenged Subsection 122(3) as violating their First Amendment free speech and other rights and, after years of litigation, the U.S. Supreme Court ultimately sustained its validity in *Hill v. Colorado*, 530 U.S. 703 (2000). The Supreme Court found that the bubble zone created by Subsection 122(3) was *not* a content-based speech restriction subject to strict scrutiny. 530 U.S. at 725. Rather, it was a content-neutral "time, place, and manner" restriction subject to intermediate scrutiny, which required that

it be narrowly tailored to serve significant governmental interests. *Id.* at 725–26.
The Supreme Court concluded that Subsection 122(3) survived such scrutiny
because Colorado's asserted interests—namely, preserving healthcare access and
protecting vulnerable patients from "unwanted encounters, confrontations, and
even assaults" by strangers—were significant, and an 8-foot bubble zone around
persons within a 100-feet of entrances to healthcare facilities was narrowly tailored
to address those interests. *Id.* at 716, 725–30.

Over two decades later, Faustin filed this action asserting facial and as-
applied First Amendment challenges to Subsection 122(3) and urging this Court to
ignore *Hill*, find that the statute is a content-based speech restriction, subject it to
strict scrutiny review, declare it unconstitutional, and permanently enjoin its
continued operation. *See* Dkt. 69 ¶¶ 6, 35, 91-101. That request is a nonstarter
because *Hill* is binding on this Court, and nothing in the intervening quarter-
century has weakened the important and compelling interests furthered by the
statute. But even if it were not, Faustin failed to muster evidence that supports her
challenge to the statute despite having months of fact and expert discovery in which
to do so. Instead, the undisputed material facts fully support granting summary
judgment in favor of the State Defendants for the reasons discussed below.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The State Defendants' Statement of Undisputed Material Facts ("SUMF") is
attached.

## LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show the absence of a genuine fact issue. *See Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). If the movant makes this showing, "the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Id.* at 1518. Where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is required. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23 (quotation omitted).

Because Faustin brings a facial challenge, *see* Dkt. 69 ¶ 35, she "bear[s] a heavy burden." *Golan v. Holder*, 609 F.3d 1076, 1094 (10th Cir. 2010) (quotations omitted). Such challenges are "hard to win," *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024), and have been sustained "'sparingly and only as a last resort,'" *Golan*, 609 F.3d at 1094 (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998)). In the First Amendment context, to prevail on a facial challenge, a plaintiff must show that "a substantial number of the law's applications are

unconstitutional, judged in relation to its plainly legitimate sweep." *Moody*, 603

U.S. at 723 (quotations omitted).

## ARGUMENT

Summary judgment in favor of the State Defendants on Count One is

warranted for three reasons. *First*, as Faustin concedes, *Hill* remains binding law

and precludes this Court from considering, much less sustaining, Faustin's claims.

Rather, this Court is bound by the Supreme Court's conclusion in *Hill* that

Subsection 122(3) is a content-neutral "time, place, and manner" restriction subject

to intermediate scrutiny, as well as its holding that the statute withstands such

scrutiny. The State Defendants therefore are entitled to summary judgment as a

matter of law without regard to the record developed here. *Second*, Faustin's facial

overbreadth challenge to Subsection 122(3) is unavailing because she has failed to

carry her burden of showing that "a substantial number of [its] applications are

unconstitutional, judged in relation to the statute's plainly legitimate sweep."

*Moody*, 603 U.S. at 723 (quotations omitted). And *third*, even in the unlikely event

that this Court rejects *Hill* and determines that Subsection 122(3) is a content-

based speech restriction subject to strict scrutiny, the undisputed record here

establishes that it withstands such scrutiny because it is "narrowly tailored to serve

compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)

(citations omitted).

### I.    Faustin's challenge to Subsection 122(3) is foreclosed by *Hill*.

It is well-settled that "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) (upholding restriction of leafleting at a fairground to a booth); *see also Frisby v. Schultz*, 487 U.S. 474, 482 (1988) (upholding ordinance that prohibited "only picketing focused on, and taking place in front of, a particular residence" as content neutral). It's not surprising, then, that the Supreme Court in *Hill* rejected the same First Amendment challenge to Subsection 122(3)—which contained identical[1] language then as it does now—that Faustin brings here. *See* 530 U.S. at 708-09. Specifically, it held that the statute serves significant and legitimate governmental interests, that it is content-neutral, and that its limitations on speech-related conduct are narrowly tailored. *Id*. at 715-718, 725, 730. Faustin concedes that "the result she seeks is contrary to currently governing precedent." Dkt. 69 ¶ 6; *see also* Dkt. 61 at p. 9 (conceding the same). However, she contends that *Hill* was "wrongly decided, is irreconcilable with intervening precedent," and seeks "to have *Hill* overruled." Dkt. 69 ¶ 6. To the contrary, *Hill* remains binding precedent on this Court, was correctly decided, and is consistent with subsequent precedent.

---

[1] The only substantive post-enactment amendment to Subsection 122(3) occurred in 2021 when the Colorado General Assembly downgraded a violation of the bubble zone from a class 3 misdemeanor to a petty offense. *See* 2021 Colo. Sess. Laws, Ch. 462, § 323 (S.B. 21-271).

The Court in *Hill* found that Subsection 122(3) had the content-neutral purpose of protecting "unimpeded access" to medical care and only regulates "the location of protests, education, and counseling." 530 U.S. at 715, 723. This content-neutral justification is consistent with other First Amendment cases decided by the Supreme Court both before and since the decision in *Hill. See e.g., McCullen v. Coakley*, 573 U.S. 464, 469, 480 (2014) (finding that protecting "public safety, patient access to healthcare, and the unobstructed use of public sidewalks and roadways" was a content-neutral purpose for buffer zone); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994) (recognizing the State's "strong interest[s]" in "public safety and order, . . . the free flow of traffic . . . , the property rights of all its citizens . . . [and] medical privacy" that were "sufficient to justify an appropriately tailored injunction to protect them"). Additionally, *Hill* applied the narrow tailoring standard for content-neutral time, place, and manner restrictions to Subsection 122(3) and found that it "leaves open ample alternative channels for communication." *Hill*, 530 U.S. at 726. This narrow tailoring standard is consistent with other cases decided both before and since the decision in *Hill. See e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989); *McCullen*, 573 U.S. at 486.

Notably, the Supreme Court has had several opportunities to overrule *Hill* in the decades since it was announced but has not done so. *See, e.g., McCullen*, 573 U.S. at 479-85 (applying intermediate scrutiny to and invalidating a state law that created a fixed 35-foot buffer zone around reproductive healthcare facilities that

prohibited all speech and lacked a consent option); *Reed*, 576 U.S. at 165-71

(applying strict scrutiny to and invalidating a town ordinance that prohibited the

display of outside signs without a permit, but imposed lesser or greater restrictions

depending on whether a sign's content was "ideological," "political," or "temporary

directional"). In fact, just this week, the Supreme Court denied certiorari in a case

seeking to overrule *Hill* over just two noted dissents. *Coal. Life v. City of

Carbondale*, No. 24-57, 2025 WL 581618 (U.S. Feb. 24, 2025). But even if this Court

agrees with Faustin's assertion that *Hill* was wrongly decided or is contrary to other

more recent U.S. Supreme Court decisions, *see* Dkt. 69 ¶ 6, this Court is bound by

the precedent set in *Hill. See Agostini v. Felton*, 521 U.S. 203, 237-38 (1997)

(reaffirming that lower courts must leave to the Supreme Court "the prerogative of

overruling its own decisions"). Granting summary judgment in favor of the State

Defendants on Count One is therefore required as a matter of law.

## II.   Faustin's facial overbreadth challenge to Subsection 122(3) falls far short of the mark.

Because Faustin raises a facial challenge to Subsection 122(3), she faces a

"heavy burden." *Nat'l Endowment for the Arts*, 524 U.S. at 580. The Supreme Court

recently reaffirmed its view that facial challenges are "hard to win" in deciding

*Moody*, 603 U.S. at 723. This is because such challenges "'often rest on speculation'

about the law's coverage and its future enforcement." *Id.* (quoting *Wash. State

Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-451 (2008)). And they

"'threaten to short circuit the democratic process' by preventing duly enacted laws

from being implemented in constitutional ways." *Id.* (quoting *Wash. State Grange*, 552 U.S. at 451).

When a challenger claims a statute facially violates the right to free speech, the Supreme Court applies a "less demanding though still rigorous standard" to "provide[ ] breathing room for free expression." *Id.* (alteration in original) (quoting *United States v. Hansen*, 599 U.S. 762, 769 (2023)). The question is whether "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (alteration in original) (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)).

To assess a facial challenge under the First Amendment, a court must: (1) assess the scope of the law, determining what it prohibits or regulates; (2) determine "which of the laws' applications violate the First Amendment"; and (3) "measure them against the rest." *Id.* at 724-25. "[I]f the law's unconstitutional applications substantially outweigh its constitutional ones," then the statute violates the First Amendment on its face. *Id.* at 723-24. Here, the Court is unable to review Subsection 122(3) according to the Supreme Court's directives in *Moody* because Faustin chose not to develop an evidentiary record in support of her facial challenge. The only specific individual she disclosed as "likely to have discoverable information" was herself. *See* Fed. R. Civ. P. 26(a)(1)(A)(i). And she did not endorse any expert witness, either affirmatively or in rebuttal to those endorsed by the State Defendants.

8

In short, Faustin failed to muster any evidence showing "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections *of parties not before* [*this*] *Court*." *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984) (citations omitted) (emphasis added). Specifically, this Court has no factual basis on which to measure whether the statute violates the rights of other protesters, leafletters, and counselors who wish to engage in "the harassment, the nuisance, the persistent importuning, the following, the dogging, and the implied threat of physical touching that can accompany an unwelcome approach within eight feet of a patient . . . [and] to argue vociferously face-to-face and perhaps thrust an undesired handbill upon her." *Hill*, 530 U.S. at 724. As a result, Faustin's overbreadth challenge to Subsection 122(3) is "underdeveloped" and fails to hit the mark set by *Moody* for facially invalidating a "duly enacted" statute. 603 U.S. at 726, 723.

## III. In the unlikely event that this Court eschews *Hill*, Subsection 122(3) withstands strict scrutiny as applied to Faustin's activity.

Because Faustin failed to develop a sufficient record to support her facial challenge, the only activity at-issue before the Court is her own. The undisputed record shows that on Monday afternoons, Faustin stands outside a reproductive healthcare clinic, and engages in activity she describes interchangeably as "picketing" or "sidewalk counseling." SUMF ¶¶ 2-3. Videos show that Faustin is able to speak to everyone who walks in or out of the clinic—or on the sidewalk outside it—and nearly all stop to accept her offered literature. Exs. 13-17. As

9

applied to this activity, the undisputed record establishes that Subsection 122(3)

serves several compelling governmental interests and is narrowly tailored to

achieve them. *See Reed*, 576 U.S. at 163.

### A. Several compelling governmental interests are furthered by Subsection 122(3).

#### 1. Colorado has a compelling interest in safeguarding fundamental personal rights that are guaranteed by its Constitution and statutes.

Through both citizen initiated and legislative enactments, Coloradans have

repeatedly adopted laws guaranteeing unimpeded access to health care, including

but not limited to reproductive health care. In April 2022, as the U.S. Supreme

Court case *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022),

was winding its way toward overruling *Roe v. Wade*, 410 U.S. 113 (1973), the

Colorado General Assembly enacted House Bill 22-1279, which is codified at Section

25-6-401, *et seq.*, and is referred to as the "Reproductive Health Equity Act"

("RHEA"). As relevant here, RHEA affirmed that: (1) "[e]very individual has a

fundamental right to make decisions about the individual's reproductive health

care, including the fundamental right to use or refuse contraception"; and (2) "[a]

pregnant individual has a fundamental right to continue a pregnancy and give birth

or to have an abortion and to make decisions about how to exercise that right."

§§ 25-6-403(1) & (2). RHEA's legislative declaration expressly found, among other

things, that "[a]ccess to reproductive health care is a matter of statewide concern

affecting the health and safety of Coloradans" and that "Colorado has a strong

history of supporting and protecting access to reproductive health care[.]" 2022 Colo.
Sess. Laws Ch. 67, §§ 1(c) & (e) (H.B. 22-1279).

In April 2023, the Colorado General Assembly enacted Senate Bill 23-188 to
codify numerous specific protections for persons who provide or access "reproductive
health care," which it defined as including, but not limited to, "family planning and
contraceptive care; gender-affirming health-care services; abortion care; prenatal,
postnatal, and delivery care; fertility care; sterilization services; and treatments for
sexually transmitted infections and reproductive cancers." § 12-30-121(1)(e); *see also*
2023 Colo. Sess. Laws Ch. 68 (S.B. 23-188).

Then, in 2024, Colorado's electorate overwhelmingly approved Amendment
79 to the Colorado Constitution, which provides, in relevant part, that "[t]he right to
abortion is hereby recognized." COLO. CONST. art. II, § 32.

As these enactments show, Colorado has a compelling interest in ensuring
respect for the fundamental rights of all persons to access medical counseling and
treatment, generally, as well as to access or provide reproductive health care,
specifically, that are guaranteed by its Constitution and statutes. *See* COLO. CONST.
art. II, § 32; §§ 25-6-403(1) & (2); § 12-30-121(1)(e); *see also Dobbs*, 597 U.S. at 289
("return[ing] the issue of abortion" to state legislative bodies). This interest
undoubtedly includes the enactment of Subsection 122(3) in the exercise of its
"police powers to protect the health and safety of [its] citizens." *Medtronic, Inc. v.
Lohr*, 518 U.S. 470, 475 (1996). And while the Supreme Court in *Hill* concluded that

this interest, as well as Colorado's "interest in evenhanded application of the law," were "unquestionably legitimate," 530 U.S. at 703, 715, they further rise to the level of compelling given the competing fundamental rights secured by the statute. *Cf. Locke v. Davey*, 540 U.S. 712, 718-19, 722-24 (2004) (concluding that Washington had a compelling interest in complying with the antiestablishment clause in its own constitution and rejecting free exercise challenge to its denial of funding for vocational religious instruction); *Widmar v. Vincent*, 454 U.S. 263, 271 (1981) ("We agree that the interest of the University in complying with its constitutional obligations may be characterized as compelling.").

> ### 2. Colorado has a compelling interest in protecting public health by ensuring *all* patients' unimpeded access to health care facilities to obtain *any* medical counseling and treatment.

History teaches that the types of activities subject to the bubble zone created by Subsection 122(3)—namely, protesting, leafleting, and counseling—impede patients from accessing health care facilities to obtain medical counseling and treatment. Indeed, the statute's enactment in 1993 occurred against the backdrop of elaborate and intense protests outside abortion clinics, which increased in the 1980s and onward, as anti-abortion activists who were frustrated with the inability to overturn *Roe*, channeled their frustration into more "direct action." SUMF ¶ 36; *see also Hill*, 530 U.S. at 715 (noting that "the legislative history makes it clear that its enactment was primarily motivated by activities in the vicinity of abortion clinics"). By the late-1980s and into the 1990s, some Colorado health care facilities that

provided abortion experienced protests five days a week, and the number of protesters ranged from a handful to hundreds of people. SUMF ¶¶ 37-38. During that same period, persons seeking access to health care at such facilities, including but not limited to abortion care, had to walk through gauntlets or corridors of protestors. SUMF ¶ 39.

The organization most associated with the escalation of anti-abortion protests in Colorado during the 1980s was Operation Rescue. SUMF ¶ 40. Its stated goal was to "stop specific abortions on specific days." SUMF ¶ 43. To do so, protesters often combined "gentle" rhetoric and imagery with more graphic anti-abortion language and ephemera. SUMF ¶46. Some served as "sidewalk counselors" who tried to make direct contact with persons outside of abortion clinics, while others carried signs that pronounced "Abortion Kills Babies" or "Abortion is Murder" with large pictures of either live "babies" or "aborted ones." SUMF ¶¶ 47, 45. From a tactical standpoint, sidewalk counselors seek to get close to patients and use physical proximity to try to convince the patient not to have an abortion, intimidate the patient to achieve the same ends, portray the patient as a "victim" who will be traumatized by the abortion, confuse the patient, or divert the patient to crisis pregnancy centers, which are anti-abortion organizations masquerading as abortion providers. SUMF ¶¶ 53-57.

According to one 2018 survey, 88% of abortion clinics in the United States face some kind of anti-abortion activity outside; 23% face daily protests and 40%

face weekly protests. SUMF ¶ 44. A report of recent first-hand accounts of patients

attempting to access health care facilities that provide abortion care documented:

> protestors screaming at them, calling them names, jumping in front of
> their cars and refusing to move, throwing pamphlets into open car
> windows, recording faces by video, offering to adopt the patient's child
> or pay for her pregnancy care, preaching at them, and, in one instance,
> calling out the patient by name over the speaker system the protestors
> had erected.

SUMF ¶ 58. In that same report, patients reported feeling fearful, angry, shamed,

and embarrassed as a result of the interaction with protestors, and some recorded

high blood pressure as a result of the interaction. SUMF ¶ 59. Not surprisingly,

onsite protesting often delays or prevents patients from obtaining abortion care.

SUMF ¶ 15. The circumstances of patients encountering interference while seeking

legally available medical care is unique to the abortion context and is unacceptable

from a medical standpoint. SUMF ¶ 18.

The fervency of protest and the diverse strategies of anti-abortion activists

have made abortion care in America unlike any other medical experience. SUMF

¶ 60. Sidewalk counselors and protestors in other roles have sought to manipulate

personal space around the patient and public space around the clinic to stop

individual abortions. *Id.* In *Hill*, the Supreme Court acknowledged the "legitimacy"

of States' interest in exercising their police powers to protect public health and

safety and stated that such "interest may justify a special focus on unimpeded

access to healthcare facilities[.]" 530 U.S. at 715 (citing *Madsen*, 512 U.S. 753;

*NLRB v. Baptist Hosp., Inc.*, 442 U.S. 773 (1979)). The State Defendants contend

that this interest rises to the level of compelling and the record here establishes

that Subsection 122(3) advances Colorado's compelling interest in protecting

patients' public health by ensuring their unimpeded access to all health care

facilities that provide any medical counseling and treatment, including but

certainly not limited to abortion care.

### 3. Colorado has a compelling interest in protecting public safety by avoiding unconsented to verbal communications and/or confrontations between patients and non-patients outside of health care facilities.

The 8-foot bubble zone created by Subsection 122(3) protects the public safety

of *all* persons who come within 100-feet of any health care facility by reducing the

likelihood of "unwanted encounters, confrontations, and even assaults[.]" *Hill*, 530

U.S. at 729. Proxemics, which is the study of the ways in which people structure

and use space, explains how it does so. SUMF ¶ 20. The United States is considered

a noncontact culture, which means that we do not expect strangers to approach

within 1 to 2 feet of us. SUMF ¶ 21. Proxemics teaches that there are four "zones" of

interaction, although the distances are not always exact: (1) the public distance,

which is beyond 10 or 12 feet, and is reserved for public interaction with strangers

and officials in which the speaker is unknown to the listener; (2) the social distance,

which is between 4 and 12 feet, and is used for nonintimate interactions with casual

friends and coworkers; (3) the personal distance, which is between 18 inches and 4

ft, and is used for interactions with close friends; and (4) the intimate distance,

which is between zero to 18 inches, and is reserved for interactions with family, close friends, and intimate partners. SUMF ¶¶ 22-26.

Expectancy violations theory deals with what happens when a person violates our expectations concerning proxemics; if a person approaches closer than expected under the proxemics framework, we call it a violation. SUMF ¶¶ 27-28. Violations can be positive or negative, but all violations draw attention away from the topic at hand and toward the violation and the violator. SUMF ¶¶ 29-30. And although close physical proximity can convey affection, it can also convey hostility or a threat. When the approacher is a stranger, research suggests close proximity is more likely to convey a threat than affection. SUMF ¶ 35.

A violation involving a stranger approaching closer than expected outside of a medical facility is likely to be interpreted as a negative violation. SUMF ¶ 31. And in that same context, if the stranger approaches close enough to touch, doing so creates an experience of a privacy invasion and can even trigger a feeling of threat. SUMF ¶ 32. Such an approach by a stranger is the quintessential negative violation. *Id.* As a result, the advisable approach for effective stranger-to-stranger communication outside of a medical facility would be to respect the 8-foot outer boundary of the social distance zone and not risk creating the alarm that crowding creates. SUMF ¶¶ 31-33. Research suggests that the most effective way to educate or persuade a stranger outside a medical facility is to avoid crowding the stranger and to instead maintain a respectful distance. SUMF ¶ 34. Subsection 122(3)

codifies these proxemics principles to protect patients from unconsented encounters with non-patients that are likely to be perceived as threatening, while permitting the distance that is most effective for stranger-to-stranger communications.

In *Hill*, the Supreme Court found that "the fact that the statute was enacted, in part, because the General Assembly 'was concerned with the safety of individuals seeking wide-ranging health care services, not merely abortion counseling and procedures,' added to the substantiality of the government interest that it served." 530 U.S. at 713-14 (quoting *Hill v. Thomas*, 973 P.2d 1246, 1258 (Colo. 1999) (citations omitted)). The State Defendants contend that this interest rises to the level of compelling and the record here establishes that, according to the scientific principles of proxemics, Subsection 122(3) advances Colorado's compelling interest in protecting public safety by avoiding unconsented verbal communications and/or confrontations between patients and non-patients outside of health care facilities.

### 4. Colorado has a compelling interest in protecting public health and welfare by avoiding potential trauma to and adverse outcomes for *all* patients, as well as their families, medical providers and staff, and communities.

The 8-foot bubble zone created by Subsection 122(3) protects the public health of patients who seek abortion care. From a medical standpoint, there is strong evidence that protestors interacting with patients seeking abortion services at a clinic increases anxiety, stress, stigma, fear, shame, and low self-esteem in the patients. SUMF ¶ 71. In turn, stress and anxiety increase the risk of adverse surgical outcomes for women who seek abortion care. SUMF ¶ 72. Onsite protesting

often delays or prevents women from obtaining abortion care. SUMF ¶¶ 15, 61.

Sidewalk counseling, defined as personally and politely talking to a woman and

giving her information related to abortion to convince her to pursue an alternative

to abortion, could pose a barrier to access to abortion care, particularly where the

woman does not consent to the interaction. SUMF ¶ 62. Evidence establishes that

delays in obtaining abortion care negatively impact women's health, and preventing

women from obtaining abortion care negatively impacts their short-term mental

health. SUMF ¶¶ 15-16. Preventing women from obtaining abortion care increases

mortality and decreases life expectancy. SUMF ¶ 17. Laws protecting safe access to

abortion clinics protect the health of women seeking abortion care. SUMF ¶ 19.

Barriers to abortion access increase as pregnancy progresses and are

associated with worsening mental health impacts and negative reproductive health

outcomes, financial strains, and personal, family and social consequences. SUMF

¶ 65. Disparities in abortion care access disproportionately affect low-wage earning

people and people of color, contributing to additional unwanted births, preterm

births, shorter interim spacing between child births, and interfering with the care of

other dependents of the pregnant person, educational advancement, employment,

and economic opportunity. SUMF ¶ 66. These social determinants are well

described in the literature to directly harm the health and the quality of life for the

individual seeking an abortion and their families. SUMF ¶ 67.

Access barriers to abortion care also create obstacles to patients who are seeking to access other clinical services that are necessary to promote and sustain health for *all* clinic users. SUMF ¶ 63. Clinicians face severe safety risks and legal threats, leading to a significant loss of medical professionals willing to provide abortion services, exacerbating healthcare shortages for services that are indispensable for healthy pregnant people and for healthy babies and new parents. SUMF ¶ 68. These harms are broad and impact all people, not just those who actively seek abortion care, resulting in unhealthy communities and increases in healthcare spending for public financers of care and society overall. SUMF ¶ 69. Overwhelming evidence demonstrates that population health, family health, and individual health is harmed when healthcare access provided by abortion care clinicians is limited or prevented. SUMF ¶ 70.

*Hill* discussed Colorado's interest in "controlling the activity around certain public and private places," and acknowledged "the unique concerns that surround health care facilities," stating:

> Persons who are attempting to enter health care facilities—for any purpose—are often in particularly vulnerable physical and emotional conditions. The State of Colorado has responded to its substantial and legitimate interest in protecting these persons from unwanted encounters, confrontations, and even assaults by enacting an exceedingly modest restriction on the speakers' ability to approach.

530 U.S. at 728-29. The State Defendants contend that this interest rises to the level of compelling and the record here establishes that, according to medical evidence, Subsection 122(3) advances Colorado's compelling interest in protecting

public health by avoiding potential trauma to and adverse health outcomes for patients who seek abortion care, and more broadly in protecting the public health and welfare of patients, their families, medical providers and staff, and communities.

### B. Subsection 122(3) is narrowly tailored to achieve Colorado's compelling interests.

The bubble zone created by Subsection 122(3) is carefully calibrated to serve the compelling governmental interests identified above. First and foremost, the statute applies narrowly to places where patients cannot protect themselves through the traditional First Amendment self-help remedies of avoidance or counter-speech, while leaving open all other places of communication. *See* § 18-9-122(4) (defining "health care facility"). In most situations, "the remedy to be applied" for inaccurate or upsetting speech "is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring); *see also United States v. Alvarez*, 567 U.S. 709, 727-28 (2012). But as numerous state and federal laws recognize, a patient's privacy rights—including the right *not* to share private personal information with strangers—is at its zenith in the medical context. *See, e.g.*, Pub. L. 104-191 § 264; C.R.S. § 6-1-1303(24) (defining "sensitive data" to include data revealing "a mental or physical health condition"). To engage in counter-speech outside a medical facility would require many patients and non-patients to divulge sensitive information about the care they are seeking.

20

Instead, Subsection 122(3) imposes "[a] bright-line prophylactic rule [which] may be the best way to provide protection, and, at the same time, by offering clear guidance and avoiding subjectivity, to protect speech itself." *Hill*, 530 U.S. at 729. The statute's plain language ensures that patients seeking medical counseling and treatment of any kind have unimpeded access to health care facilities while still allowing non-patients to publicly express any message and viewpoint they choose. *See* § 18-9-122(1) (the stated intent is to "balance[ ]" these competing rights).

Notably, Subsection 122(3) does not regulate speech; rather, it regulates the placement of non-patients and their proximity to patients, health care providers, health care facility staff, patient escorts, and bystanders while "within a radius of 100-feet from any entrance door to a health care facility." *See* § 18-9-122(3); *see also Hill*, 530 U.S. at 723 (the statute "simply establishes a minor place restriction"). Specifically, the statute imposes an 8-foot place limitation on certain non-patients. *See* § 18-9-122(3); *see also Hill*, 530 U.S. at 724. This minor limitation still enables non-patients to express their messages and viewpoints to patients and others from a distance at which they can be heard in a normal conversational tone even without amplification, SUMF ¶ 13, hand documents and other materials to patients and others who are willing to take them, SUMF ¶¶ 7-9, and effectively convey their messages and viewpoints to patients and others in a stranger-to-stranger setting. SUMF ¶¶ 12, 21-22, 32-34. From a scientific standpoint, setting the bubble zone at 8-feet is precisely the outer boundary of the social distance that is advisable for

effective stranger-to-stranger communication and that does not risk creating the threatening arousal that crowding creates. SUMF ¶¶ 33-34.

Subsection 122(3) does not prohibit the content of any non-patient's messages or viewpoints. It also does not prohibit non-patients from asking patients and others if they are willing to accept leaflets, handbills, or other materials, or if they consent to coming closer than 8-feet and, if consent is given, does not prohibit a non-patient from doing so. *See* § 18-9-122(3). The statute does not prohibit non-patients from publicly expressing false statements of fact or otherwise misinforming patients and others. *Id.* It further does not prohibit non-patients from engaging in any non-verbal expression of their messages and viewpoints, such as displaying signs or posters. *Id.* The statute does not regulate the volume of non-patients' communication with patients and others. *Id.* And it does not compel non-patients to make any public statements, require non-patients to verbally identify themselves to patients and others, or require non-patients to display any personal identification while publicly expressing their messages and viewpoints to patients and others. *Id.*

The "knowingly" scienter requirement of Subsection 122(3) also demonstrates its narrow tailoring. As the Supreme Court noted with approval in *Hill*, "[t]he statute does not . . . prevent a leafletter from simply standing near the path of oncoming pedestrians and proffering his or her material, which the pedestrians can easily accept. 530 U.S. at 727 (footnote omitted). As a result, it concluded that:

> unlike the floating buffer zone in *Schenck*, which would require a
> protester either to stop talking or to get off the sidewalk whenever a

patient came within 15 feet, the 'knowingly approaches' requirement in the Colorado statute allows a protester to stand still while a person moving toward or away from a health care facility walks past her.

*Id.* at 713. This is what Faustin does; she stands on the sidewalk and offers materials to persons who pass by her. SUMF ¶ 9; Exs. 13-17. In short, the statute does not impose any duty to withdraw on the protester, leafletter, or counselor.

Finally, the undisputed record establishes that, in practice, Subsection 122(3) restricts the location of Faustin's activities only to the extent necessary to achieve Colorado's compelling interests. She has been able to volunteer in support of the pro-life movement in Colorado for the past 40 years. SUMF ¶ 1. Nearly every Monday, Faustin engages in protesting, leafleting, and counseling within 100-feet of the entrance to Healthy Futures Clinic, which is a healthcare facility located in Colorado that provides primary care, including but not limited to abortion care. SUMF ¶ 2. Her participation in these activities depends on only weather conditions and personal scheduling availability. *Id.* In the past year, she appeared outside Health Futures "[p]robably half of the Mondays, over the year." *Id.* Faustin agrees that she has been "effective" in communicating her chosen messages over the past thirty years that she has been subject to Subsection 122(3). SUMF ¶ 12.

Faustin describes her work outside Healthy Futures both as "picketing" and "sidewalk counseling." SUMF ¶ 3. When picketing outside Healthy Futures, Faustin wears a sign hung from a cord around her neck that states "Healthy Futures Kills Children" and purports to depict fetuses at 8 weeks and 22 weeks from conception.

SUMF ¶ 4. She also "give[s] . . . literature and information about alternatives and eligible educational information[.]" SUMF ¶ 5. Faustin's husband is the Director of Operation Rescue and most of the written materials that she distributes are provided to her by Operation Rescue. SUMF ¶ 6. Faustin hands the materials to "anyone who will take them," including men and women who are beyond the age of pregnancy. SUMF ¶ 7. She explained her activities as follows: If a person is passing by her on the sidewalk:

> as they pass me, just a passerby, I just say, 'Can I give you some information?' If they are someone going in or out of the clinic, I have to call out to them, and, in a loud voice, and, depending, if they are not walking right past me, you know, 'Can I give you some information?'

*Id.*

In her one-hour shift outside Healthy Futures, Faustin distributes between 7 and 10 packets of written information to persons within 100-feet of its entrance. SUMF ¶ 8. Faustin does not ask if she can approach those persons as permitted by Subsection 122(3); rather, she stands in a fixed place within 100-feet of the entrance to Healthy Futures and waits for persons who either are passing by her on the sidewalk, or going into or coming out of Healthy Futures, to come within 8-feet of where she is standing. SUMF ¶ 9. Faustin typically is accompanied by two other volunteers, both of whom sit stationary on the sidewalk, and one of whom displays a sign that says: "The Killing Place." SUMF ¶ 10.

Faustin would like to approach other persons, without their consent, within 1- to 2-feet when she is protesting, counseling, and leafleting outside of Healthy

Futures. SUMF ¶ 12. But video taken outside of Healthy Futures shows that Faustin is presently able to effectively picket, counsel, and leaflet. SUMF ¶ 79 & Exs. 13-17. In the videos, Faustin's large sign, and thus her message that "Healthy Futures Kills Children," is clearly visible to passersby and clinic users. *Id*. The videos show numerous people approaching Faustin closer than 8-feet to receive her materials. *Id*.; *see also* SUMF ¶ 8. At her in-person deposition, Faustin was seated at least 9- to 10-feet away from opposing counsel and agreed that she was able to hear their questions without their voices being amplified in any way. SUMF ¶ 13.

No law enforcement action has ever been taken against Faustin pursuant to Subsection 122(3); specifically, she has never been cited, investigated, or prosecuted for allegedly violating the statute. SUMF ¶ 11. She is not aware of any investigation or prosecution of any of her "sidewalk counselor compatriots" for allegedly violating the statute. *Id*. Faustin has never had any interaction with the police while outside of the entrance to Healthy Futures. *Id*.

## CONCLUSION

Based on the foregoing reasons and authorities, the State Defendants respectfully request that the Court grant them summary judgment on Count One of the Amended Complaint [Dkt. 69].

DATED: February 27, 2025.

PHILIP J. WEISER
Attorney General

*s/ LeeAnn Morrill*
LEEANN MORRILL*
First Assistant Attorney General
EMILY B. BUCKLEY*
Senior Assistant Attorney General
PETER G. BAUMANN*
Senior Assistant Attorney General
Colorado Attorney General's Office
1300 Broadway, 7th Floor
Denver, Colorado 80203
Telephone: (720) 508-6000
Email: leeann.morrill@coag.gov
        emily.buckley@coag.gov
        peter.baumann@coag.gov
*Attorneys for Defendants Governor
   Jared Polis and Attorney General
   Philip J. Weiser*
*Counsel of Record

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2025, I served a true and complete copy of the foregoing **THE STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** upon all counsel of record for the parties who have appeared to date in Civil Action No. 23-cv-01376-SKC-NRN electronically via e-filing with the CM/ECF system maintained by the Court.

_s/ Carmen Van Pelt_____
Carmen Van Pelt, Senior Paralegal